NEW YORK LIFE INSURANCE COMPANY v. MARGARET McGOWAN.

1. INSURANCE CONTRACT; *Waiver of Agent; Liability of Company.* Where the agent of an insurance company, whose business it is to solicit applications for insurance and receive the first premiums, accepts a written application of a person, duly signed, waives the payment in money of the first semi-annual premium, and in lieu thereof takes a promissory note, and thereupon executes and delivers to the assured a receipt for such note, and agreeing in such receipt, that (provided the application should be approved at the home office,) to furnish him a policy upon his life within fifteen days from date, or if his application should be declined, to return the amount to him or his order on demand, (it being agreed that no liability was assumed by the company unless the said risk should be approved and a policy issued at the home office;) and within the said fifteen days the application is approved at the home office and a policy is issued thereon, and sent to the general agent of the company where the application was taken, for the applicant, and after the death of the assured the company has proofs of death made out under the policy, accepts them, sends a draft payable to the beneficiary of the policy, delivers such policy to such beneficiary and obtains the same receipted and satisfied, and such beneficiary named in the policy does not obtain such draft on account of the fraud of the agent, *held,* that notwithstanding a recital in the policy that it should not be binding until the premium is actually paid in money, and the note is not paid, nor the policy otherwise delivered prior to the death of the assured, the insurance company is liable.

2. PRINCIPAL, *Liable for Fraud of Agent.* An insurance company is liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, and omissions of duty of a general agent in the course of his employment, although the company did not authorize or justify such misconduct.

3. ———— An insurance company is liable to a third person in a civil action for the frauds, deceits and misrepresentations of its general agent, when the acts so committed are apparently within the general scope of his authority, although not so in fact, on the grounds that such general agent was employed in that character of business, and held out by the company as a person authorized by it as fully to be trusted.

*Error from Leavenworth District Court.*

MRS. MARGARET McGOWAN brought suit against *The N. Y. Life Insurance Company,* and Reuben Partridge and

George H. English, to recover an alleged balance due her on a policy issued by said insurance company on the life of her former husband. Partridge was the general agent for said insurance company, having his office in Leavenworth. As such agent he was authorized to appoint and did appoint local and soliciting agents, who reported to him. One of such soliciting agents, G. M. Pinkham, solicited and received an application from George Roberts (then the husband of plaintiff) for an insurance on his life. Roberts resided at Fort Leavenworth. The premiums were to be paid semi-annually in advance, each premium being $42.96. No part of this premium was paid in money. Pinkham allowed Roberts $5 on account of the premium, for which Roberts agreed to assist Pinkham in obtaining other applications for insurance at the Fort. For the balance of said first premium, Pinkham took Roberts' note and gave the following receipt:

$37.96.　　　LEAVENWORTH, KAS., SEPT. 17th, 1872.

I have received from George Roberts, note for thirty-seven 96-100 dollars, for which (provided the application is approved at the home office) I agree to furnish him a policy upon his life for $2,000 from the New York Life Insurance Company, within fifteen days from date; or, if this application shall be declined, to return the amount to him or his order on demand, it being expressly understood and agreed, that no liability is assumed by the company unless the said risk shall be approved and a policy issued at the home office in New York.　　　G. M. PINKHAM.

One of Partridge's letters to the *Insurance Company*, given in evidence on the trial, is as follows:

LEAVENWORTH, KAS., OCT. 18th, 1872.

WM. H. BEERS, *Vice Prest.—Dear Sir:* I am notified of the sudden death of George Roberts, insured under policy No. 92,315. *Items:* Application was made Sept. 17th. Five dollars paid when application was made, a note taken for $37.96, balance of first premium, payable on presentation of the policy. The insured called for the policy the day before it arrived, and said he was ready for it. The writer of this saw the insured some two days after the arrival of the policy, and notified him of the fact. The same evening, but after eight o'clock, he called at the office with the agent, Mr.

Pinkham, to get the policy. Neither myself nor clerk were in, and he left soon after — I think the next day — for Fort Dodge, with government horses, he being an employé, where he was taken suddenly ill, and died. His family and home are at Fort Leavenworth. I believe he was a man of good habits, robust constitution. Am not informed of what disease he died. Neither do I know whether agent Pinkham gave him a binding receipt, as he is in the extreme southern part of the state, working in our interest. Under the circumstances, shall I construe the note as payment on the policy? Please answer by telegram, that we may satisfy anxious, inquiring friends, who press us for an answer.

Truly yours,    R. PARTRIDGE.

In another letter, under date of 22d December 1872, from Partridge to M. Franklin, the president of the *Insurance Company*, Partridge transmitted the "proofs of the death of George Roberts;" and after making reference to his letter of 18th October, he says:

"You will notice, a note was given for the most of the premium. The money, after the death of Mr. Roberts, was promptly tendered to me, but not knowing the facts (only by report) as to the death of Mr. Roberts, I thought it prudent to decline taking it. The money however is deposited, awaiting my order; and unless you advise me to the contrary, I will send it in our report of the 1st of January."

On the 3d of January 1873, Partridge sent to the company his monthly report, (for month of December 1872.) This report covered remittances amounting to $1,802.60, and included "$42.96," "in payment (of premium on) No. 92,-315, George Roberts"—of which premium his report shows that Partridge retained $16.11 as commission. On the 7th of March 1873, the plaintiff received $500 only, on account of said policy, and executed therefor on the back of the policy, the following receipt:

$2,000.    FORT LEAVENWORTH, MARCH 7th, 1873.

Received of the New York Life Insurance Company, two thousand dollars, in full of all claims and demands due me on the within policy upon the life of my late husband, George Roberts.    MARGARET ROBERTS.

Other facts are stated in the opinion, *infra.* This action

was commenced in March 1876, to recover the balance of $1,500 due on the policy, with interest, (less $42.96, amount of the second semi-annual premium, which the company, by the terms of the policy, had the right to deduct.) The answers of Partridge and English were general denials. The *Insurance Company*, answered, first, a special denial of any indebtedness; second, that the policy sued on was void; third, that the whole amount of the policy, $2,000, had been paid. Trial at the May Term 1876 of the district court, B. S., judge *pro tem.*, presiding. (During the trial the action was dismissed as to English.) The findings of fact are voluminous. The conclusions of law based thereon are as follows:

"1st.–The contract made and entered into by and between said English and plaintiff, [of date 20th February 1873, by which English agreed to undertake to collect of the insurance company the amount of insurance money due on the policy, and providing that "if he should be able to collect or compromise said claim without suit he was to have and retain all he could collect over and above $500,"] and the power-of-attorney from plaintiff to said English, [of same date, authorizing English to compromise plaintiff's claim, and to indorse any draft payable to her received in payment thereof,] are, and were at the time of the execution of the same, void and of no force or effect whatever.

"2d.–The release of said plaintiff upon said policy of insurance was, at its execution, and is, void, and said policy should be considered as though the said receipt or release had never been written thereon.

"3d.–The receipt to said English from said plaintiff, [of date 10th March 1873, for $500, in full for all claims and demands against the insurance company,] was and is of no force or effect, and is void.

"4th.–There is due to plaintiff from the defendants the New York Life Insurance Company and Reuben Partridge, the sum of $1,457.04, with interest from the 28th of February 1873, the same being $322.97, which together amount to the sum of $1,780.01, for which the plaintiff is entitled to judgment against said New York Life Insurance Company and Reuben Partridge, defendants, and costs of suit."

Judgment accordingly. New trial refused. The *New York Life Insurance Company* brings the case here on error.

*Stillings & Fenlon,* for plaintiff in error:

1. The facts found by the court were not sustained by sufficient evidence; but if sustained by competent evidence, they were not sufficient to require the insurance company to pay a second time the money already paid by it and receipted for by defendant in error, and now either in her hands, or in the hands of her lawfully-authorized attorney. Plaintiff had no right to go to the known agent of the company for advice as to the measures she should take, and as to what lawyer she should employ, to enforce her claim. Where an individual or corporation employs an agent in a distant place to transact its business, such person or corporation is not responsible for any fraudulent recommendations which may be given by such agent, especially when such recommendations are given as to matters such as the employment of an attorney to act against the principal. The declarations of the agent made *within the scope of his authority,* bind the principal; but it was never before supposed that it was within the scope of the authority of an agent to select the attorney for an adverse party pressing a claim against his principal. If the findings of fact and law in this case are correct, it comes to this, that if a person's agent should tell his creditor that such person could not or would not pay some claim held against his principal, and the creditor under the delusion caused by such representations should sell the claim at a ruinous sacrifice, or make a contract with a lawyer by which he would obligate himself to pay a heavy fee, the agent would thereby make the principal liable for the loss sustained thereby. Such cannot be the law. 3 Kernan, 365; 2 Hilliard on Torts, 322; 12 East, 632; 11 Eng. Law & Eq. 424; Walker, 149; 7 Wis. 419; Ware, 175; 10 Mass. 397, 403; 15 Johns. 44; 6 Vermont, 334; 8 Wend. 494; 4 J. J. Marsh. 456; 18 Johns. 363; 1 Hill, (S. C.) 204.

2. But the findings themselves are against the evidence. The finding that Partridge knew that the claim would be paid, is not only not sustained by the evidence, but is against the

reason of the transaction, and against the positive evidence of Partridge, corroborated by that of English. We objected to the introduction of the evidence of the conversations of plaintiff with English and Partridge, to bind the company, but the evidence was admitted and acted on. It seems to us clearly not competent to bind the company. But, taking all that was said in all the conversations between plaintiff and her attorney, English, and between her and Partridge, and who can say that Partridge's statements to her that she had no legal claim against the company, were not true, and his opinion that the company might consider it an equitable claim, was not the true state of the case? There was no proof that Pinkham had power to make a contract to insure on credit; and it was not pretended that anybody had paid the first premium, or that the policy had been delivered at the time of the death of Roberts, unless on the Indian's theory, that the *giving of a note* was *payment.*

*Taylor & Gillpatrick,* and *Joseph McDonald,* for defendant in error:

1. It is claimed that the insurance company was not liable on the policy written on the life of Roberts. But this can scarcely be regarded as a serious objection to the judgment below. The court will hardly declare void a policy which was by the company admitted to be valid and binding. The contract was complete upon the delivery of the "binding receipt." The receipt given was on a blank furnished by the company. The note was delivered for the premium, less five dollars which was taken as paid, and all the circumstances show a complete contract. 1 Washington's Ct. Ct. Rep. 93; 20 Wal. 569. But even if the note is not regarded as prepayment—though the court so finds, and though such was unquestionably the fact—still it must be taken as a credit for the premium, which the agent by general usage had a right to give. 20 Wal. 568; 25 Conn. 207; 7 Nevada, 116; 5 L. & A. Ins. Rep. 152; 101 Mass. 558; 26 Iowa, 52, 72; Sharpstein's Dig. Life Ins. 168; Bliss on Insurance, §§ 150,

191. We ask the court to note well the letter of Partridge, the general agent, of date 18th Oct. 1872.

2. The court below finds that, "Partridge, by further false and fraudulent representations, acting as such general agent, and through George H. English, an attorney-at-law, at Leavenworth, induced said plaintiff to employ said English, and this with intent to cheat and defraud the plaintiff out of all of said policy except $500." The court finds that he did this to cheat and defraud; and this presupposes a collusion with the attorney for the purpose, as the evidence clearly enough shows was the case. The idea of counsel for plaintiff in error seems to be, that, conceding the liability of the company if Partridge had taken the money directly, yet because he does it through another the principal is relieved from all responsibility. Why, he might have removed the receiver of the stolen swag still further from himself, by taking in another, or still another, into the game; and still the fraud would be his, and theirs, and that of the principal. It were a reproach indeed, if so simple a subterfuge could defeat the ends of justice. The findings of fact bring the responsibility of plaintiff in error fully within the rule as laid down by the authorities. Story on Agency, § 452; Story on Contracts, § 134; Dunlap's Paley on Agency, 303; 1 Met. 202, 562; 2 Hill, 465; 41 Ind. 288; 23 Wend. 264; Kerr on Fraud and Mistake, 115; 61 Penn. 381.

3. But it is claimed that Partridge was not acting within the scope of his authority. Exactly what his authority was, the company would not show. This however is certain, the company made him its agent specially to pay or pass over to plaintiff the draft drawn in payment of the amount due. If they did not confide in him the whole matter, why did they not send it to *her?* Had they never heard of dishonest agents? Did they not know it was possible for cunning to devise, and dishonesty to practice, a fraud upon the payee, even then? What does he do? He hands the draft to a third person, through whom in part he has misled and deceived defendant in error, and who holds a power of attorney known

by Partridge to be executed because of falsehoods and mis-representations from himself and the attorney. It was a conspiracy to rob the widow under the forms of law, and the court finds that defendant in error is not bound by the receipt, the release, or the supposed payment. Partridge first acted fraudulently, as the general agent, in matters at least apparently within the scope of his duties. And beyond all question, he in the second place fraudulently passed the draft to English, as if indeed he had passed it from his right hand to his left; and except the $500, it was as if no payment had been made at all. "One who pays with knowledge of a fraud, is in no better position than if he had not paid at all." Am. L. Res., April 1877, p. 251. The company placed Partridge in a position to impose upon plaintiff, and now seeks to evade responsibility by denying his authority. 13 Wal. 234. The testimony of Partridge shows conclusively that the company knew all the facts concerning the death of Roberts, the payment of the premium, and the delivery of the policy; that with this knowledge, it had decided that the policy was a valid claim against it, and promised to pay it; that Partridge was notified by it of its conclusion, and that he deliberately used his position, intrusted to him by the company as its agent, to defraud the defendant in error out of a large portion of the amount due on said policy, and that he did so defraud her, and convert the money to his own use. And as to English's testimony, we simply ask a careful survey of the circumstances in that connection. It is not necessary to prove fraud directly. It may, and from the nature of the case, must, in most cases, be inferred from the circumstances and facts proved. (Kerr on Fraud and Mistake, 384; 19 Mich. 57.) Taking the testimony of these two men together, the findings of the court are more than sustained. A clearer case of collusion and conspiracy to defraud the defendant in error, could not possibly be made out. The implication of English in the fraud, though palpable, is not at all necessary to the right of recovery here. 51 Illinois, 380. The court below, in the trial of this case, saw the wit-

nesses, their bearing, etc., upon the stand, and through a long trial carefully weighed the evidence offered, and the corroborating circumstances, and reached its conclusions of law and fact naturally enough; and to urge a reversal of the judgment in this case is to do violence to every rule for the weighing of testimony, and every principle for the relief of the victims of fraud and imposition. Instead of *opinions* having been expressed by Partridge to plaintiff, the court will see that he made positive statements, and of a character fatal to her claim. She even wished to write to the company, and note his responses when she spoke of so doing. Observe with what sly deception the web is woven, and the net is spread. Scan her statement of the meeting with Partridge at the Fort; his pretense that he had, after having seen her, *accidentally* met English, when in fact the two rode together to the Fort, and for the purpose of fixing up a job on her. The draft was expected within a few days — the sixty days were nearly up — and the power-of-attorney should, to look all right, be of an earlier date than the draft. When lawyers expect to fairly fight a case, do they usually take such steps as were used here? The contract, and the power-of-attorney, are part of the plan. In eight days after, the draft for the full amount is forwarded by mail from New York. The whole performance was an impotent effort to hedge against possible consequences in the future. We ask a careful examination of the whole testimony, if the second proposition of plaintiff in error receives any consideration. The books are sprinkled thickly with decisions on questions of fraud. In *Bryant v. Simoneau*, 51 Ill. 327, the rule as to proof of fraud is clearly laid down.

A humorous writer says, "There never was a time when the insurance business was so safe as it is now. All that a man wants to do after he gets insured is to die right quick, before the company does; but he doesn't want to be fooling around, living and having a good time." But the most fruitful subject for the satirist, is the insurance agent, and his adjustment of losses. A man takes a chance in this game of

life insurance—where to win, he must pay the penalty of his life—and dies. Then the trouble just begins. The company, that is, the *insurance agent*—for it can do nothing except by an agent—the president and secretary are at last but agents—with faculties sharpened by long experience, and aided by the multiplied conditions and covenants contained in the policy, commences the work of evasion, or compromise; and arts to this end are practiced, rivaling those of the devil himself. That many agents are honest and conscientious, is true; but that all should be such, is equally true. And assuming the innocence of the company—not safe to do in many cases—it should be taught the salutary lesson that, in the management of its sacred trusts, honest men, and honest men only, must be employed, or the principal will be held responsible for all knavery and deceit.

The opinion of the court was delivered by

HORTON, C. J.: This action concerned litigation of the most deplorable character, and comprised transactions so disreputable that one could wish they had never occurred. The dishonest insurance agent, who figured in the proceedings in despoiling a woman of the greater part of $2,000 due her on an insurance-policy on the life of her dead husband, deserves lasting disgrace.

The case arose out of the following circumstances : On the 17th of September 1872, the defendant in error, then the wife of George Roberts, applied to the New York Life Insurance Company for a policy of $2,000 on the life of her husband. The first semi-annual premium on the policy was paid with a note for $37.96, and the agent of the company executed therefor a receipt by which the policy was to issue within fifteen days, provided the application was approved at the home office. On the 23d of the same month, the insurance company issued to said defendant in error the policy applied for, and transmitted the same from the home office to their agent, Reuben Partridge, at Leavenworth, and the same was received by the agent a few days after the 23d, and during the

life of the assured.  On the 17th of October 1872, George Roberts died.  Proofs of his death were forwarded by the agent Partridge to the home office for the company, upon blank proofs furnished from the office for that purpose. Sometime after the death of Roberts, the defendant intermarried with Mr. Theo. L. McGowan.  On September 17th 1872, and for a long period before that time, the said Reuben Partridge was and had been the general agent of the insurance company for the states of Kansas and Nebraska, and the territory of Colorado, and other portions of the west.  He was in charge of the general western agency of the company, with his general office at Leavenworth city, in this state, and he continued to be such agent until after the 7th of March 1873.  On 28th February 1873, within the sixty days after the reception of the proofs of loss, a draft for the sum of $1,957.04, (that sum being the amount due on the policy less the second semi-annual premium,) was executed by the insurance company, payable to the order of the defendant in error, to settle and pay the amount of the policy; and the insurance company sent the draft forthwith to its agent Partridge, at Leavenworth, which was duly received by him. Partridge induced the defendant in error to believe that the policy of insurance was void, by his fraudulent and false representations to her that the company declined to pay anything, and that she had no valid or legal claim under the policy against the insurance company.  About eight days prior to the sending of the draft of $1,957.04 from the home office to him to pay the policy, he induced the woman to employ one George H. English, an attorney-at-law, then living at Leavenworth, to attend to her demand against the company, and thereupon a contract was entered into between said attorney and the defendant in error, by which she was to allow the attorney all that he could recover, or that the company would pay on the policy, over $500.  Upon the receipt of the draft of $1,957.04, the agent Partridge delivered the same to English.  The latter indorsed it, under a power of attorney which he held, and paid the defendant in error $500,

and retained $1,457.04.  Through the statements of Partridge and English, the defendant in error was then induced to acknowledge in writing the receipt of the full amount of the policy, although she only received $500.  The fact that the company had sent the draft to pay the policy was concealed from her by both English and Partridge.  English commenced no suit for the money, wrote no letters to the company, gave really no services in the matter.  The company never objected to the payment of the policy prior to sending the draft, and Partridge in all of his correspondence with the company assumed the policy was valid and binding. About a year after the death of her husband, the defendant in error received an insurance almanac, in which she saw that the insurance company printed her name as having received $2,000, the full amount of the policy, and thereupon she wrote to the company, and began to investigate the matter, as to what amount of money had been sent to their agent Partridge to pay to her.  Having ascertained the deceit and fraud practiced upon her by the agent of the company, she commenced this action in the district court of Leavenworth county, on 10th March 1876, to recover the balance of the money, which she claimed due on the insurance policy, to-wit, $1,457.04, with interest thereon.  The case was tried to the court, a jury being waived.  Judgment was rendered in favor of the defendant in error for $1,780.01, and costs.

The insurance company object to the judgment, and claim that it should be reversed, and the company released from all liability, because, *first*, there was no proof that the agent of the company, who took the application for the policy of insurance, and issued the receipt to George Roberts for the note received in payment of the first premium, had power to make a contract to insure on credit, and the giving the note was no payment of any premium; *second*, that the findings of the court were against the evidence, and do not sustain the judgment; *third*, that the insurance company was not responsible for any of the fraudulent recommendations of its agent Par-

tridge, nor liable for his deceits, concealments, or false representations in the premises.

As to the first objection, it is sufficient to say that the application was made to and accepted by an authorized agent of the company. The note was given and accepted as payment. An agent of an insurance company whose business it is to solicit applications for insurance, and receive the first premiums, has the right to waive the condition requiring the payment in money, and to accept the promissory note of the applicant, or of a third party in lieu thereof. May on Ins. 345, 346; *Mississippi Valley Life Ins. Co. v. Neyland*, 9 Bush. (Ky.) 430, and authorities there cited. In this case however, there can be no question raised as to the authority of the agent to give the receipt, as the company issued the policy, sent it to their general agent Partridge, and when proofs of the death of Roberts were received, the company calculated the amount due on the policy after deducting the amount of the second semi-annual premium (stipulated for in the policy,) and sent the sum in a draft to their agent, payable to the order of the defendant in error, to whom the policy was delivered to be receipted and satisfied. The company thus fully ratified the action of its agent in accepting the note and executing the receipt for the policy, and in treating the policy as valid, and as if actually delivered before the death of the assured.

In regard to the second objection, after a careful perusal of all the evidence, we do not see that the district court could have intelligently arrived at any different conclusions of fact than those stated in the findings. The company never resisted the legality of the policy, promptly adjusted the demand, and Partridge had no valid reason to represent the policy void. The attorney recommended was an intimate friend of the agent—so much so that Partridge himself stated in his evidence that he frequently loaned him money, and when he had any legal business, English generally attended to it. Partridge in his communications to the company treated the policy as a valid one, and had no reason to think otherwise.

English does not seem to have done anything in the case, other than to draw up a contract by which he was to have all of the money coming from the company except $500, and a power-of-attorney by which he could indorse the draft when received. When the draft came to Partridge, he retained it till Mr. English who was then temporarily absent from Leavenworth, returned, and then he delivered it personally to him. The defendant in error, as a witness, gave the following account of the manner in which she was inveigled into the web spread by Partridge to entrap her, and of the mode adopted to keep her silent as to the money she was paid, while she was systematically robbed of the fruits of the policy under pretense of conferring great favors on her:

"About a week after the death of my husband, Mr. Roberts, I waited on Mr. Partridge, the old man, at his office in Laing's building. I had never seen him, and I introduced myself to him. He said he was glad I had called; that he had often thought about me. Finally I asked him if he thought the company would pay the policy. He said no, he did not think they would. He said my claim was not a legal one. He said he would write to the company and see what they would do. He said in a week or so I could call at his office. A week or ten days after I called at his office, and he said he had not heard from the company. I said to him, 'since I have been here I have thought that I had better write to the company.' He said it was not necessary for me to write to the company; that he was here representing the company, and he said if I wrote to the company the letter would be sent back to him, and it would not benefit me any whatever. He said, 'I assure you I will do what I can for you. Since I saw you I have made a thorough investigation, and I find that your husband was a popular man, and a highly-respected citizen. If I had known it, I could have withheld the policy, and paid the premium for you; but I was true to the company, and sent it to New York.' He said if I would call any time I was in town I might hear from the company. When he said it was no use for me to write to the company myself, I never gave it any more consideration. I called in a week or so, and he said he had heard from the company, and they refused to pay me; that my claim was not a legal one. He said that if Mr. Roberts"

21—18 KAS.

had only paid the small amount of twenty-five cents, it would have been legal, but as he had not it was not, and I had no claim on the company. I never called at Mr. Partridge's office after that. About two months, or probably a little more, after I was in Mr. Partridge's office, Mr. Partridge called on me at the Fort. He came up he said to see if I had taken any steps in that matter towards trying to get my money from the company. I said I had not. He said if I intended to take any steps in the matter I had better do so soon. He said after a certain length of time I could not do so. He did not say how long that time was. He asked me if there was any person I was acquainted with, any lawyer I wished to consult about it. I said, none in particular, that I knew no lawyers. He said such being the case, he would recommend George H. English; that he was an honest, trustworthy man, and could be relied on. I asked where his office was, and he told me. I said, if it would not be too much trouble I wished he would speak to Mr. English for me. He said he would. He then went away.

"In about a week or so he came again, and said he had not seen Mr. English yet, but said that any time I would come down, if I would call at his office, he would take me to Mr. English's office and introduce me to him. I said I would, and he went away. In about half an hour after, he came back and said that as he was going home he had met Mr. English on the road, and he had come to the house with him. He said, 'I want you to speak to Mr. English yourself; I will go out and ride round the fort in his buggy, and you can speak to him on the subject.' He said, 'I want you to promise me before I go not to say anything to Mr. English, that I have spoken to you about him. Speak to him as though speaking your own mind. Another thing I want you to promise me: whatever the company gives you, you will have to acknowledge the full amount of it; if you don't, they will not pay you anything; you will have to acknowledge the receipt of the full amount, and if any friend asks you what they gave you, don't tell them; tell them that the company satisfied you, but don't say in what way, but you will have to acknowledge the full amount, whatever you get.' I said, if that was a fact, I would have to acknowledge a lie, if I acknowledged the receipt of $2,000, and did not get it. He smiled, and said, 'we have to do many things; half a loaf is better than no bread.' He then went out, and Mr. English came in. I did not know what to say to him, but

finally I said, 'I suppose Mr. Partridge has mentioned my case to you, that I wished to see you.' He said, yes, he knew something of it; that Mr. Partridge and him were speaking of it as they were coming up together from the city to the fort. I said if that was the case, it was not necessary for me to say anything more. He said no. I asked him if he was willing to take the case. He said yes, but it was seldom he ever made anything out of such cases. He wanted to know how much I wished to make the claim. I said I thought I was entitled to the whole amount. He said I was not, because no money was paid, as Mr. Partridge said. I asked him if he thought the company would be willing to pay me half. He said he thought not, he did not know but they would give me $500. He said he would try his best to have them give me $1,000. He said if they gave me $1,000, he would keep $200 of it for his fees; if they gave me only $500, he would keep only $100 for his fees. A few days after that he came to my house and said the company would give me $500, but I would have to acknowledge the receipt of the full amount, otherwise they would not give me anything; that they were giving me that as a gift; that I was not entitled to anything. Of course I signed the papers, receipted for the full amount, and he paid me the $500 down. While I was signing my name to the receipt for the $2,000, I said to Mr. English I thought it was a strange way to transact business; I was signing my name to a receipt for $2,000, and getting only $500. He said he knew, but business was business. That was all I said to Mr. English.

"*Ques.*—How did you come to sign the receipt on the back of the policy? Was it for the reasons you have stated? *Ans.*—Certainly; they said they would not give me anything unless I acknowledged the full amount.

"*Q.*—When you signed it, it was under the representation, as you say, that the company would pay you $500? *Ans.*—He said the company would not give me any more than $500; that they were under no obligations to give me anything, because the claim was not a legal one. Mr. Partridge said all the time that the claim was not a legal claim.

"*Q.*—Had Mr. English told you the same thing? *Ans.*—Mr. English told me, and Mr. Partridge also.

"*Q.*—State whether it was by reason of your relying on the statements of Partridge and English, that you signed these papers? *Ans.*—Certainly, I relied on what Mr. Partridge said. I supposed he spoke the truth. He said the claim

was not a legal one, and it would be better for me to employ an agent.

"*Q.*–Mr. English paid you $500? *Ans.*–Yes, sir."

Mr. English admitted that he only paid defendant in error $500; and all the incidents of the transaction fully supported the statements of Mrs. McGowan. That English and Partridge would deny any collusion between themselves in the matter, is to have been expected in view of their conduct. Parties guilty of such practices as herein set forth, are not accustomed usually to confess as to their own bad acts. "Like all other facts, fraud may be proved by circumstances. We should seldom, if ever, hope to prove fraud by the admissions of a party; nor should we expect to find direct and positive evidence of the fact. Whatever circumstances, when proven, convince the mind that the fraud charged has been perpetrated, is all that is required. While fraud cannot be established by circumstances that merely raise a suspicion, yet, when they are so strong as to produce conviction of the truth of the charge, although there may remain some doubt, then it is fraud." *Bryant v. Simoneau*, 51 Ill. 324. Tested by this rule, the findings are strongly sustained. But it is not necessary to go thus far. The findings of a trial court are conclusive, if there is any evidence to sustain them; and we cannot disturb them, where the findings are upon conflicting evidence. We hold therefore, that the findings of the court upon the questions of fact cannot be reversed by this court, as there was testimony clearly tending to establish the facts found. *Hobson v. Ogden's Executors*, 16 Kas. 388.

In conclusion, we are called to pass upon the third objection presented, and which has been so ably and forcibly urged in the argument of the learned counsel for plaintiff in error. This is really the main question in the case: Is the insurance company liable under the circumstances for the balance of the draft, that is, for the $1,957.04 originally due on the policy, less the $500 paid to defendant in error? or, must the owner of the policy be remitted for her remedy to a worthless insurance agent, and an insolvent attorney? If

the latter be the conclusion, then certainly the terse remark of the old English vicar, that "Law and equity are two things which God hath joined, but which man hath put asunder," would have some foundation in truth. Fortunately, no such reproach can, in this case, be brought against our jurisprudence. Nor need we seek any new principle of the law to enforce the liability of the insurance company. It is our comfort to stand *super antiquas vias*. Nearly two hundred years ago it was decided by Holt, C. J., in the case of *Hern v. Nichols*, 1 Salkeld, 289, that the merchant was responsible for the deceit of his factor, though not *criminaliter*, yet *civiliter;* "for seeing somebody must be a loser by this deceit, it is more reason, that he that employs and puts a confidence in the deceiver, should be a loser, than a stranger." Mr. Waite states the law as follows: "It is a universal rule, based upon principles of policy, propriety, and justice, that if a principal puts his agent in a condition to impose upon innocent third persons, by apparently pursuing his authority, the principal will be bound by his acts, and he must lose, in preference to such third persons." Story says: "It is a general doctrine of law, that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent (unless indeed he has authorized or coöperated in those acts or misdeeds,) yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligence, and other malfeasances, or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize or justify, or participate in, or indeed know of such misconduct, or even if he forbade the acts, or disapproved of them."

In the case at bar, Partridge was the general agent of the insurance company. He had charge of the business in two states, and several territories. He collected money for premiums, solicited insurance, by his own efforts, and through sub-agents, transmitted the premiums to the company in New York city, appointed sub-agents, kept a record of the

policies issued in the agency, received the drafts or checks for losses within his territory, secured the policies receipted, when paid, and forwarded them to the company, and generally had the management of all the business of the company within the states and territories under his control. He was the person to whom the defendant in error had the right to apply for the payment of her policy. He was the person who received the draft with which to pay it. He was the person who should have informed her of the action of the company, and of its recognition of her rights, and made the payment of the sum due. He was acting within the general scope of his authority. If the company had sent to their agent the $1,957.04 in currency, with which to pay the policy, and this agent had himself retained all but $500, upon the plea to the beneficiary thereof that this sum only had been transmitted him, and the company would pay no more, would it be contended that if such beneficiary accepted the $500 and receipted the policy, relying solely on the false representations and fraud of the agent, she could not recover the balance of the sum of the company? If the agent had forged the name of the payee to the draft, and having collected the amount thereof, and appropriated all of it but $500 to his own use, and had delivered the $500 to the defendant as the proceeds of such draft, would it be claimed by counsel that the policy had been paid, and the company relieved from all responsibility? We think in the reason of things, both of these questions would be answered in the negative. The company did not pay the loss by merely sending its draft or check of $1,957.04 to its agent. The company had to pay the money to the party. If the agent retained any part of it, the part thus retained was still unpaid—still remained due. The fact that, by collusion between Partridge and English, the woman was induced to permit the money to go into the hands of English, does not materially change the principle contended for. The denial of the validity of the policy, the introduction to the attorney, the recommendation of his honesty and ability, the making

of the contract, the power of attorney, and the delivery of
the draft to English, instead of the woman, were all means
adopted for the sole purpose of cheating the policyholder out
of the money retained from her.    This roundabout way was
evidently artistically planned by Partridge, to lull the sus-
picions of his victim, and to obtain the policy receipted, to
return to the company.  It is also likely that he thought that
the measures adopted by him in the transaction would con-
ceal his own criminality, and relieve himself and the com-
pany from further payment.    The company is as much
responsible for the action of Partridge, as if he had himself
drawn the money on the draft, and used it for his own
benefit.    For his conduct under these circumstances, the
company must suffer the loss — not the person, who trusted
the authorized agent empowered to pay the claim.   "It is
more reason, that he that employs and puts a trust and con-
fidence in the deceiver, should be a loser, than a stranger."
It is not necessary that the company, or even Partridge,
should have received any of the money from English, or any
benefit therefrom.  If the agent deemed it best to place in
other hands than his own, the proceeds of his imposition,
the company, for whom he is acting, is not thereby relieved
of liability.   The company is not bettered by such action,
and the conduct of the agent is the more censurable, as he
has neither the excuse of his necessities, nor the motive of
cupidity.   If the action of the agent is to be attributed to his
general viciousness, rather than sudden temptation, the reason
is stronger for the accountability of the company, because the
company has no legal or moral right to give influence, posi-
tion, and power to men, as its agents, to deal with others in
its behalf, who are generally depraved and untrustworthy.
If however it be conceded, that the agent Partridge in doing
the acts compained of, was not in fact directly the agent of
the insurance company, still, the company would be held
liable, not however upon the rule that the agent acted for the
company in that particular transaction, but because he was
employed by the company in that character of business, and

was so held out as a person authorized and fully to be trusted. "When the agent in such a case does an act which is apparently within the general scope of his authority, although not so in fact, if the principal were not held liable for the act, a third person, who had reason to believe that the agent was reliable, and possessed authority in the particular matter from the general character of his employment, might suffer loss; hence the law holds the principal liable upon the ground that he, rather than a third person equally innocent, should suffer." *Dougherty v. Wells, Fargo & Co,,* 7 Nev. 368; *Clark v. Metropolitan Bank*, 3 Duer, 248.

We do not think that the other exceptions taken in the proceedings demand any consideration, and hence, upon well-settled principles, and the strongest equity, we hold that the defendant in error can recover. The judgment must therefore be affirmed.

All the Justices concurring.